S. PETER LEBOWITZ AND THERESA LEBOWITZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lebowitz v. Commissioner
Docket No. 27543-82
United States Tax Court
T.C. Memo 1991-344; 1991 Tax Ct. Memo LEXIS 399; 62 T.C.M. (CCH) 249; T.C.M. (RIA) 91344; July 29, 1991, Filed *399 Decisions will be entered in the amounts previously computed. Thomas S. Carles, Alan Scott Laufer, and John L. Pritchard, for the petitioners. Ismael Gonzales, for the respondent. COHEN, Judge. COHEN
MEMORANDUM OPINION This case is before the Court on remand from the Court of the Appeals for the Second Circuit in , revg. and remanding our prior opinion, . Petitioners were limited partners in a partnership (Fenwick) formed in 1976 to mine coal in West Virginia. The partnership subleased certain property (the Hewitt tract) for $ 1,200,000 cash and a $ 4,150,000 nonrecourse note. In our prior opinion, we held, among other things, that the amount attributable to the nonrecourse note was not deductible as advance royalties because the note was contingent. Our holding was based on our conclusions that petitioners failed to establish that the value of the coal on the leased tract approached the $ 5,350,000 paid for the rights; that it was infeasible to generate profits to match the price paid for the rights; and that the purchase price of the property *400 unreasonably exceeded its true value. The Court of Appeals reversed, concluding "that the proper inquiry is between the amount of indebtedness and the value of the underlying collateral." . The Court of Appeals stated that it was remanding the case to us "for a determination of the value of the coal rights as of October 1976, as we believe there is sufficient evidence in the record to support a finding that the value of the rights at that time was at least equal to the face obligation of the nonrecourse note." . Petitioners argue that the value of the coal rights should be computed by estimating the amount of coal in tons recoverable from the property, multiplied by either a dollar amount or by the sum of the market price of coal in 1976 less the cost of extraction. Petitioners contend that there were at least 3 million tons of recoverable coal on the property, that the cost of extracting the coal was not more than $ 20 per ton, and that the value of the coal should be computed at a net of $ 8 per ton. Petitioners rely on expert testimony presented at trial and discussed in our prior opinion. Petitioners also contend *401 that the above-quoted conclusion of the Court of Appeals shifts to respondent the burden of proving that the value of the coal rights in which the partnership had an interest was less than the amount of the note. Respondent attacks petitioners' experts' testimony and points to other facts indicating that the value of the coal rights was far less than the amount of the note. Respondent relies on the history of transactions in the leased property, including a 1975 transaction in which a parcel including the 1,886-acre parcel subsequently subleased by the partnership was transferred for $ 19,600 cash and an agreement to assume a minimum royalty obligation. Respondent also relies on his experts' testimony that disputed petitioners' experts' evidence of the likelihood that coal would be recovered from the leased property. Respondent persists in arguing that petitioners have not satisfied their burden of proof as to the value of the coal rights. We are not bound by the opinion of any expert witness when that opinion is contrary to our judgment, and we may embrace or reject expert testimony. , and cases there cited. *402 In this case, however, none of the experts expressed an opinion of the fair market value of the coal rights. Petitioners' expert Steven G. Breeding expressly declined to estimate the appropriate royalty for the lease, citing his own lack of qualifications. There is no direct evidence in the record of the price at which the property in question would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. See . (We do not consider the Fenwick transaction to be evidence of fair market value, of course, because the tax benefits emphasized in promoting it suggest that the price was distorted by tax considerations. Cf. , affg. a Memorandum Opinion of this Court; .) The parties' briefs also ignore this standard definition of fair market value. In our prior opinion, we did not make a specific finding of fair market value. In view of the remand by *403 the Court of Appeals, however, we are compelled here to do the best that we can on the evidence in the record. Our conclusion is not based on the burden of proof but on the following factors. First, it is apparent from the record that qualified experts substantially disagree about the amount of coal recoverable from the property and the probable total revenue to be derived from the coal. A prospective buyer would be likely to encounter such variations of opinion and would discount substantially the most optimistic predictions about the recoverable coal reserves. Second, a prospective buyer would not be likely to disregard the consideration accepted by a knowledgeable party for a parcel including that transferred to petitioners' partnership. Notwithstanding disagreement about the comparability of the 1975 transaction in which lease rights in 2,000 acres were transferred for $ 19,600, this transaction is the only one in the record reflecting an independent price for the property that is to be valued. Third, the Court of Appeals stated that "events subsequent to the time of purchase that affect the value of the security are irrelevant; rather, the valuation test is applicable at *404 the time of purchase." . The Court of Appeals indicated that the decline in the value of the coal rights subsequent to the year in issue should not be considered in determining whether the value of the rights equals the face amount of the nonrecourse note. That decline and other subsequent events were mentioned in our prior opinion, however, only in explaining the failure of the venture, thus supporting our determination that petitioners had an actual and honest objective of making a profit even though coal was never mined on the tract. We described the preparations for operations and the external forces, including a worsening economy, foreign competition, and a miners strike, that interfered with operations. We did not rely on those facts in our conclusion that the value of the rights did not approach the amount paid. In any event, in view of the clear statement by the Court of Appeals, which is consistent with our view of applicable valuation principles, petitioners cannot now rely on post-acquisition events to bolster their claims of value. Petitioners' brief on remand argues: the Joyce report made use of a very small number of reference *405 points which were known in 1976. Numerous other reference points dated after 1976 were available to Joyce Associates, but they were all ignored by Joyce and Jaron in constructing the isopach map. Ex. AQ at 17. Had they used the newer reference points, and applied the same method, Joyce and Jaron would have computed a higher estimate of coal reserves. * * *
Similarly, petitioners assert that "at the time of trial [in 1987], the Westridge Coal Co. and the Tanner Coal Co. were profitably mining coal in these same areas." Petitioners also rely on subsequent removal of 292,000 tons of coal and payments of more than $ 600,000 on the note given by the partnership. None of these facts are properly considered in determining the value as of October 26, 1976. Fourth, the offering memorandum provided to the Fenwick investors included the Casteel report dated October 8, 1976, which estimated that there were 1.795 million recoverable tons of coal on the Hewitt tract. Subsequent estimates by petitioners' experts that there were 4.5 or 5 million recoverable tons would not have been considered by a prospective purchaser as of October 1976. The offering memorandum purported to set forth *406 relevant facts known prior to the date of acquisition. The offering memorandum gave only a cursory review of the industry, the contracts for the Fenwick project, and the risk of investment, emphasizing instead the potential tax opportunities. The offering memorandum and the Casteel report, however, are the best indication that we have of information available to prospective buyers at the valuation date. The information set forth in those materials, therefore, must be given the most weight in our analysis. The offering memorandum stated that "the Partnership will enter into agreements with contract miners to both strip mine and deep mine the Coal at a cost of $ 20 per ton, and will also enter into an agreement to sell the Coal (unwashed) on an exclusive basis to Coats for $ 28 per ton." Multiplying the recoverable tons estimated in the offering memorandum, 1.795 million times a projected net profit of $ 8 per ton, would lead to projected revenues of $ 14,360,000. The rights that we are to value have been described by the Court of Appeals as a "perpetual interest," and the gross revenues obviously would be derived over a period of years and must be discounted to reflect that fact. *407 (The note was payable at 6-percent interest over a period of 12 years.) In addition, a substantial discount must be applied for the inherent risks of mining. Such risks were described in the offering memorandum as including extreme volatility of the market price of coal, potential cancelations of the mining contracts, and changing Government regulations and international market conditions. Finally, the offering memorandum noted that the Hewitt lease provided that Coats would be permitted to purchase the property for a fixed price of $ 100,000 after payment in full of the advance royalty. Under these circumstances, we do not believe that a prospective buyer determining the fair market value of the partnership's perpetual rights to coal would have paid more than $ 1,400,000, or approximately 10 percent of the projected revenues to be received from the property over an indefinite period of time if none of the identified risks materialized. Although we have little confidence that this amount is not still an exaggeration of what could be obtained in the marketplace, it is our best judgment on the evidence, consistent with the strictures of the remand. The Court of Appeals stated *408 that "If the obligation of the note unreasonably exceeds the value of the underlying security, the transaction lacks economic substance." . Because the maximum fair market value that we have determined is approximately one-third of the amount of the note, the note unreasonably exceeds the value of the security. We reaffirm our prior conclusion that the note cannot be recognized or given effect for tax purposes prior to the time that payments are made. Decision will be entered in the amounts previously computed.